UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NUVASIVE, INC.<br><br>          Plaintiff,<br><br>v.<br><br>MICHELLE KIRBY, BLAKE BEDNARZ, and JASON GOTHAM.<br><br>          Defendants. | Civil Action No. _____<br><br>JURY DEMAND |

## COMPLAINT

For its complaint against Michelle Kirby, Blake Bednarz, and Jason Gotham, Plaintiff NuVasive, Inc., through its attorneys, alleges that:

### NATURE OF ACTION

1.  This Complaint is based on the Defendants' intentional and malicious violations of their duties of loyalty to NuVasive, misappropriation of NuVasive's trade secrets, and violations of their post-employment obligations to NuVasive. Defendants were key members of NuVasive's sales force in Western New York before abruptly resigning in October of 2011 to work for one of NuVasive's direct competitors, Lanx, Inc., in furtherance of an unlawful scheme.

2.  Defendants' roles in the unlawful scheme consist of, among other things, using NuVasive's goodwill and proprietary information for Lanx's benefit, soliciting NuVasive's customers to convert their business to Lanx, soliciting NuVasive's employees to work with Lanx, and unlawfully competing with NuVasive in direct violation of their Non-Competition Agreements. NuVasive brings this action to enjoin the Defendants' wrongful conduct, and to recover damages for the injuries they inflicted upon NuVasive.

## THE PARTIES

3. Plaintiff NuVasive is a Delaware corporation with its principal place of business in San Diego, California.

4. Defendants are former NuVasive employees who, upon information and belief, reside in or around Buffalo, New York. Defendants are currently employed by Lanx.

5. NuVasive employed Kirby as a senior spine specialist, Bednarz as an area business manager, and Gotham as a divisional sales director at the time they submitted their resignations.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction of this case under 28 U.S.C. § 1332 because this is a civil action between citizens of different states in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs. NuVasive is a citizen of both Delaware and California. Defendants are United States citizens who reside in New York.

7. Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391 (a), as defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in the district.

## ALLEGATIONS RELATING TO ALL COUNTS

A.  **NuVasive's Business**

8. Plaintiff NuVasive is a San Diego-based medical device company focused on the design, development and marketing of products for the surgical treatment of spine disorders. NuVasive is a market leader in this industry, and has pioneered the lateral approach to spinal fusion surgery. Defendants' current employer, Lanx, is also in the business of marketing products to treat spine disorders. NuVasive and Lanx are competitors in this highly-specialized industry.

9. NuVasive markets its surgical products through its exclusive sales force consisting of directly-employed personnel and exclusive sales agents. NuVasive invests substantial money into this workforce, providing personnel with comprehensive and industry-leading training and education. This training and education supplies NuVasive employees with a deep understanding of NuVasive's products, methodology, and trade secrets.

10. NuVasive invests significant time, money and resources into its personnel so that they are able to favorably represent the company and create goodwill with potential and existing NuVasive customers. This goodwill, arising from the customer relationships developed between NuVasive's sales personnel and its surgeon-customers, belongs to NuVasive as it is the product of NuVasive's significant investment.

**B.  Defendant's Employment and Contractual Obligations to NuVasive**

11. Kirby began working for NuVasive as a senior spine specialist in Buffalo, New York, on or about March 1, 2006. Her primary responsibilities were to build a deep knowledge of NuVasive's products and procedures, market NuVasive spine products, establish relationships with customer surgeons, and supervise spine surgeries using NuVasive equipment.

12. Bednarz began working for NuVasive as a spine specialist in New York in March of 2008. From July of 2010 until his resignation, Bednarz was the area business manager for upstate New York. His responsibilities included overseeing NuVasive's sales force, developing and training new hires, and teaching and training spine surgeons on minimally invasive and open surgical techniques in both the San Diego, CA, and Paramus, NJ, cadaveric labs.

13. Gotham began working for NuVasive as a spine specialist in Detroit, Michigan, in May of 2007. At the time of his resignation, Gotham was Divisional Sales Director East whose territory covered upstate New York, Maine, Vermont, New Hampshire, Massachusetts, and Michigan.

14. Because Defendants had access to and knowledge of NuVasive's proprietary information, they were required to sign a "Statement Regarding Proprietary Information, Inventions, Assignment and Non-Competition Agreement" (hereinafter "Non-Competition Agreement") as a condition of their employment with NuVasive.

15. The Non-Competition Agreement required Defendants to abide by duties of non-disclosure, non-competition and non-solicitation. True and correct copies of Defendants' Non-Competition Agreements are attached hereto as collective Exhibit A.

16. Defendants agreed to keep all NuVasive proprietary information confidential even after termination from their employment with NuVasive. According to Section II of the Non-Competition Agreement, Defendants agreed:

> At all times, both during my engagement by the Company and after its termination, I will (a) keep in confidence and trust and will not disclose any Proprietary Information except to other Company employees, agents, and representatives who need to know. . . and (b) use Proprietary Information only for the benefit of the Company.

(Ex. A at ¶ II.)

17. The terms of Defendants' Non-Competition Agreement provide that NuVasive's "Proprietary Information" includes any:

> ... information about research, development, experiments, databases, database criteria, user profiles, clinical investigations, clinical trials, trade secrets, designs, methodologies, technology, know-how, processes, data, ideas, techniques, inventions, product specifications, manufacturing processes . . . business, financial, client, marketing and product development plans, forecasts, other employees' positions, skill levels, duties, compensation and all other terms of their employment (except to the extent disclosure is permitted by law), client and supplier lists, contacts at or knowledge of clients or prospective clients of the Company. . . .

(Ex. A ¶ I.B.)

18. Defendants also agreed to refrain from soliciting any current or potential customer of the Company, or causing such a customer to alter in any manner its relationship with

NuVasive, for one year following termination. According to the "Non-Solicitation" provisions of their Non-Competition Agreements, Defendants promised:

> ...during the term of my engagement and for one (1) year thereafter, I will not . . . (ii) divert or take away, or attempt to divert or take away, or solicit or attempt to solicit, any existing or potential customer of the Company . . . with the purpose of obtaining such person or entity as a customer for a business or entity competitive with the Company, or causing such customer to alter in any manner its relationship with the Company.

(Ex. A at ¶ VI.)

19. Defendants similarly agreed to refrain from working in any capacity for a competitor of NuVasive within one year of termination. Their "Non-Competition" provisions state:

> I agree that during the course of my engagement and for a period of **one (1) year immediately following the termination of my relationship with the Company** for any reason . . . I will not, without the prior written consent of the Company, (i) serve as a partner, employee, consultant, officer, director, manager, agent, associate, investor, or otherwise for . . . or affiliate myself with, any Conflicting Organization.

(Ex. A ¶VII). The terms of the Non-Competition Agreement define "Conflicting Organization" as any organization that is engaged in or sells a product or process "which resembles, competes with, or replaces a product" sold or marketed by NuVasive. (Ex. A ¶VII).

20. The Non-Competition Agreement's non-compete provision only restricts the employee from working for a competitor in the same geographic area, providing that "[t]he foregoing covenant shall be applicable only to the geographical territories in which [the employee's] employment/consulting activities for the Company were primarily conducted . . ." (Ex. A at ¶ VII).

C. **Defendants' Departure from NuVasive.**

21. Dr. Andrew Cappuccino is a spine surgeon in Buffalo, New York, who specializes in, among other things, the lateral spinal surgeries developed and marketed by

NuVasive. NuVasive engaged Dr. Cappuccino to serve as an exclusive consultant and clinical advisor in 2003.

22. Because of Dr. Cappuccino's role as an exclusive consultant to NuVasive, Dr. Cappuccino and NuVasive entered into various General Consulting and Services Agreements which imposed confidentiality requirements on Dr. Cappuccino regarding his work for NuVasive and assigned any rights Dr. Cappuccino had to the intellectual property, proprietary information, or trade secrets developed in the course of his consulting to NuVasive.

23. Kirby was the NuVasive sales representative primarily responsible for servicing Dr. Andrew Cappuccino and his partner, Dr. Ryan DenHaese. NuVasive trained and equipped Kirby with the knowledge and expertise in the spinal field permitting her to establish this relationship in order to effectively market NuVasive products and sell them to surgeons in her territory. Kirby possessed NuVasive's materials and confidential and proprietary information that she was required to return at the conclusion of her employment. Upon information and belief, Kirby has failed to return certain NuVasive equipment and proprietary information.

24. As Kirby's supervisors, Gotham and Bednarz were collectively responsible for overseeing all NuVasive spine specialists in upstate New York, including Kirby. Like Kirby, they possess NuVasive's confidential and proprietary information and, upon information and belief, are currently utilizing that information to NuVasive's detriment.

25. Unbeknownst to NuVasive, Dr. Cappuccino decided to unilaterally end his relationship with NuVasive and enter into a similar agreement with Lanx which is memorialized in a September 15, 2011, contract between Dr. Cappuccino and Lanx. Upon information and belief, in his new role with Lanx, Dr. Cappuccino assisted Lanx in implementing a scheme to:

    a. utilize NuVasive's trade secrets to assist Lanx in manufacturing and marketing a competing system for lateral spinal fusion surgery and other products that compete with the products he assisted NuVasive in developing;

      b.    leverage his reputation as a leader in the field of lateral spinal fusion surgery to convince (without justification) other surgeons that Lanx's to be released system for lateral spinal surgery would be superior to NuVasive's market leading system; and

      c.    assist Lanx in poaching certain key members of NuVasive's sales force, including Defendants.

26. Some of Dr. Cappuccino's first projects for Lanx directly involve Lanx's new system for lateral spinal fusion surgery, training other surgeons on how to perform lateral spinal fusion surgery, and training Lanx's sales force.

27. Dr. Cappuccino surreptitiously provided services to Lanx before informing NuVasive of his intent to end his relationship with NuVasive. To that end, Dr. Cappuccino did not provide NuVasive with written notice of his intent to terminate his relationship with NuVasive until November 22, 2011, yet he billed Lanx for services he performed on its behalf in October of 2011, including services related to Lanx's development of its lateral spinal fusion system.

28. Upon information and belief, one reason for concealing Dr. Cappuccino's intent to leave NuVasive for Lanx was to allow Lanx to unveil their new consultant at the National Association of Spine Surgeons annual meeting which was held in Chicago between November 2 and 5, 2011.

29. Defendants first learned of Dr. Cappuccino's intention to leave NuVasive for Lanx no later than the summer of 2011 yet never informed NuVasive of impending departure. Rather, they chose to assist and advance Lanx's plan while deceiving NuVasive into believing that they continued to fulfill their duties as trusted employees.

30. On August, 22, 2011, Bednarz and Gotham travelled to Lanx's headquarters in Colorado and presented a business plan to Lanx's chief executive officer, chief financial officer, senior vice-president of sales, and general counsel. Upon information and belief, this business

plan focused on their intent to: (a) form a company named Empire Medical Systems, Inc. which would serve as a distributor of Lanx's products in Western New York; (b) move a substantial amount of NuVasive's business in their sales region to Lanx; (c) solicit and convert NuVasive's sales force to Lanx so that the surgeons in their sales region would not see an interruption in their service; and (d) covertly enact their scheme so that NuVasive would not be aware of their intentions until after they converted NuVasive business to Lanx.

31. Bednarz and Gotham knew Dr. Cappuccino intended to sever his relationship with NuVasive and sign a new agreement with Lanx at the time they presented their business plan to Lanx.

32. On September 1 and 2, 2011, Lanx's director of recruitment and Gotham exchanged several emails which addressed materials he and Bednarz needed to submit in order for Lanx to offer employment to them.

33. On September 16, 2011, one day after Dr. Cappuccino signed his agreement with Lanx, Lanx's then-senior vice-president of sales directed his colleagues to prepare written employment offers for Bednarz and Gotham.

34. On September 20, 2011, Kirby emailed Bednarz and Gotham to inform them that Dr. Cappuccino was using Lanx's products in a surgery rather than the NuVasive products he historically used. Bednarz and Gotham forwarded this email up the chain to more senior NuVasive executives, and, along with Kirby, feigned surprise that Dr. Cappuccino would utilize Lanx's products. These messages from Kirby, Bednarz, and Gotham were designed to induce NuVasive into believing the Defendants were still acting in NuVasive's best interests when, in fact, they were keenly aware of Dr. Cappuccino's intent to join Lanx and participating in the scheme to convert NuVasive's business to Lanx.

35. Lanx emailed employment offers to Bednarz and Gotham the same day Kirby "discovered" that Dr. Cappuccino was utilizing Lanx's products. Lanx emailed a similar employment offer to Kirby and two other members of NuVasive's Buffalo-area sales force the next day. All of Lanx's employment offers were for significantly more money than NuVasive paid the recipients, and are grossly excessive of industry standard.

36. On or before October 8, 2011, after exchanging several emails and draft employment offers with Lanx, Kirby and the other two members of NuVasive's Buffalo-area sales force entered into employment agreements with Lanx.

37. Documents that Kirby and the other two members of NuVasive's Buffalo-area sales force submitted to Lanx on or before September 21, 2011, prove that Dr. Cappuccino encouraged them to leave NuVasive for Lanx. In fact, the resume Kirby submitted to Lanx stated that she is "responsible for all spine surgeries with Dr. Andrew Cappuccino, Dr. DenHaese."

38. On October 3, 2011, well after Dr. Cappuccino first encouraged Kirby to leave NuVasive for Lanx, Kirby emailed Bednarz, Gotham, and other NuVasive managers about her inability to predict whether Dr. Cappuccino would continue his recent practice of utilizing Lanx's products in surgery rather than NuVasive's. In response to this email, Gotham informed Kirby and various NuVasive executives that he would work to regain Dr. Cappuccino's business for NuVasive.

39. Kirby's and Gotham's statements were, at best, intentionally misleading, as they were keenly aware of Dr. Cappuccino's intentions and were dedicated to joining Dr. Cappuccino at Lanx. At the time of her October 3, 2011, email, Kirby knew Dr. Cappuccino would continue to use Lanx products instead of NuVasive products because of his new business relationship with Lanx. Similarly, Gotham knew that, contrary to the promises in his email, he would not make an

attempt to regain Dr. Cappuccino's business for NuVasive as Gotham would soon become a Lanx employee.

**D.      Defendants' Blatant Breach of Their Non-Competition Agreements.**

40.     Bendarz, Gotham, Dr. Cappuccino, and Lanx induced Kirby to violate her Non-Competition Agreement by allowing her to continue to work with Dr. Cappuccino. Additionally, Kirby continues to interface with the other surgeons in her former NuVasive territory.

41.     Kirby resigned from NuVasive on October 17, 2011. On October 25, 2011, her second day as a Lanx employee, Kirby received an email from Lanx's senior project manager regarding the Lanx products required to adequately service Dr. Cappuccino's account, and began violating her Non-Competition Agreement by servicing or assisting others in servicing Dr. Cappuccino's account.

42.     To assist Kirby in servicing Dr. Cappuccino's account, she, Bednarz, Gotham, and others successfully solicited other NuVasive sales personnel to join Lanx in order to accomplish indirectly what Kirby could not accomplish directly – service the surgeons in Kirby's former territory, including, but not limited, to Dr. Cappuccino.

43.     Kirby's employment agreement with Lanx demonstrates that she is responsible for Dr. Cappuccino and other surgeons in her former NuVasive territory as it entitles her to receive a quarterly bonus if she meets or exceeds a set sales quota in her region, which includes the hospitals where Dr. Cappuccino and his partner perform surgeries.

44.     Fewer than six weeks after Kirby left NuVasive, on December 2-3, 2011, in violation of her post-employment obligations to NuVasive, Kirby accompanied Dr. Cappuccino to the didactic and cadaveric portion of the Cornell Weil MIS Spine Course in New York City.

45.     On or around January 27-28, 2012, Kirby was further observed unlawfully competing with NuVasive while working as a Lanx representative at the Lanx Lateral Lab in Las

Vegas, Nevada. During Kirby's time in Las Vegas, on January 27, 2012, Kirby accompanied Dr. Cappuccino to a Circ du Soleil performance. The next day, January 28, 2012, Kirby, Dr. Cappuccino, Dr. DenHaese, Bednarz, and Gotham met for dinner at the restaurant China Poblano in Las Vegas, Nevada. When some NuVasive employees approached this table during their dinner, Dr. Cappuccino stated that Lanx was "going after all [NuVasive's] guys."

COUNT I (Breach of Duty of Loyalty)

46. As NuVasive's trusted employees, Defendants were required to act in a manner consistent with NuVasive's trust in them and bound to exercise the utmost good faith and loyalty in the performance of their duties.

47. Defendants breached their duties of loyalty by, among other things:

   a. utilizing NuVasive's confidential information in furtherance of the scheme to convert NuVasive's business to Lanx during the course and scope of their employment;

   b. failing to inform NuVasive of Dr. Cappuccino's planned departure from NuVasive;

   c. fraudulently deceiving NuVasive about the status of its business relationships with Dr. Cappuccino and other surgeons by intentionally misrepresenting their knowledge of Dr. Cappuccino's intent to join Lanx;

   d. fraudulently deceiving NuVasive into believing that they were continuing to perform their duties when, in fact, they were concealing their knowledge about Dr. Cappuccino's imminent departure and plan to convert NuVasive's customers and employees to Lanx;

   e. tortiously interfering with NuVasive's contractual relationships with other members of its sales force by inducing them to join Lanx; and

   f. soliciting business on behalf of Lanx while still employed by NuVasive.

48. Defendants breached their duties of loyalty in order to obtain lucrative contracts from Lanx which greatly exceed fair market value for their services. Had Defendants not

breached their duties of loyalty, Lanx would not have provided them with stock options or grants, excessive salary, or other benefits.

49. Defendants' breaches of their duties of loyalty injured NuVasive's reputation in its business community. Had Defendants' complied with their obligations to NuVasive, NuVasive could have prepared for the negative publicity that accompanied one of its consultants unexpectedly moving to a competitor.

50. Defendants also aided and abetted each other's breach of their duty of loyalty.

51. As a direct result of Defendants' breaches, and Defendants' aiding and abetting of the others' breaches, NuVasive has been irreparably harmed and has suffered damages which will be proven at trial, but should include:

    a. the amount NuVasive paid in salary, commission, and benefits to each Defendant during the months they acted in breach of their duties of loyalty;

    b. a disgorgement of moneys and benefits, including but not limited to stock options and stock grants, that Lanx provided to the Defendants as a result of their willingness to violate their duties of loyalty;

    c. the costs and attorneys' fees NuVasive incurred in investigating and prosecuting their breaches of their duties of loyalty;

    d. all other damages NuVasive is entitled to recover at law or in equity; and

    e. punitive damages.

## Count II (Breach of Contract)

52. Defendants' Non-Competition Agreements are reasonably limited both in time, to one year following termination of employment, and in geographic scope, to the territories in which Defendants worked for NuVasive.

53. NuVasive has performed its obligations under Defendants' Non-Competition Agreements.

54. Under their Non-Competition Agreements, Defendants agreed not to disclose any confidential or proprietary information they learned while employed at NuVasive; to refrain from working for a competitor of NuVasive in the same geographic location for one year following termination of their employment with NuVasive; and to return all NuVasive confidential and proprietary information at the conclusion of their employment at NuVasive.

55. Defendants have breached their Non-Competition Agreements by disclosing proprietary information, including, but not limited to, NuVasive's lateral approach to spine surgery, to a direct competitor, Lanx, without NuVasive's consent or approval. In addition, upon information and belief, they breached their agreements by failing to return to NuVasive confidential and proprietary information that was in their possession prior to the conclusion of their employment.

56. Defendants knowingly breached, and continue to breach, their Non-Competition Agreements by obtaining employment with one of NuVasive's direct competitors in the same geographic region they worked for NuVasive, soliciting the accounts they serviced for NuVasive, and actively participating in the scheme to move Dr. Cappuccino's business and the business of other physicians in their NuVasive sales territory away from NuVasive and to Lanx.

57. As a direct result of Defendants' breaches, NuVasive has been irreparably harmed and has suffered damages. While the amount of these damages will be proven at trial, they should include:

   a. all NuVasive's lost profits that are attributable to Defendants' breaches of their contractual obligations;

   b. the value of the management time NuVasive expended in uncovering Defendant's breach of their contractual obligations and remediating the damage to NuVasive's business caused by those breaches; and

    c. compensation for injuries to NuVasive's reputation that were caused by negative publicity surrounding Defendants' defection and breaches of their contractual obligations to NuVasive.

### COUNT III (Misappropriation of Trade Secrets)

58. In the course of business, NuVasive owned and developed highly-sensitive trade secrets. NuVasive's trade secrets include, but are not limited to, the development, manufacture, and marketing of NuVasive's lateral approach to spine surgery, information related to product development, methodology, sales, pricing, marketing research, customers and analysis. These trade secrets give NuVasive a competitive advantage over those who do not know or use these trade secrets, particularly NuVasive's lateral approach to spine surgery.

59. NuVasive has expended significant time, effort, and money developing these trade secrets. This information would be valuable to competitors of NuVasive, if disclosed to them. Accordingly, NuVasive takes extensive precautions to limit disclosure and dissemination of this information.

60. Defendants acquired knowledge of NuVasive's trade secrets through their employment relationship with NuVasive that gave rise to a duty of confidentiality. This duty of confidentiality was further evidenced in the Non-Competition Agreements that Defendants signed.

61. Shortly after Defendants abruptly resigned, Lanx announced plans to develop and market a lateral approach to spine surgery remarkably similar to the approach utilized exclusively by NuVasive.

62. Defendants, individually, and in a conspiracy with Lanx and Dr. Cappuccino, misappropriated NuVasive's trades secrets, including, but not limited to, NuVasive's lateral approach to spine surgery and marketing strategy for this surgical system.

63. Through their roles in the scheme to unlawfully convert NuVasive's business to Lanx, and by accepting employment from Lanx in the same geographic regions they served with NuVasive, Defendants maliciously and intentionally disclosed valuable and proprietary NuVasive trade secret information in violation of their Non-Competition Agreement.

64. Upon information and belief, NuVasive has suffered damages as a result of Defendant's misappropriation of trade secrets, and has been irreparably harmed by the disclosure of its proprietary information.

65. As a result of Defendants' willful misappropriation of trade secrets, NuVasive is entitled to recover damages which will be proven at trial, but should include:

> a. a disgorgement of all monies Defendants received from Lanx in the form of salary, commissions, bonuses, benefits, stock options or stock grants that were earned as a result of Defendant's misappropriation of NuVasive's trade secrets;
>
> b. NuVasive's lost profits that were caused by the Defendants' misappropriation of NuVasive's trade secrets;
>
> c. NuVasive's attorneys' fees; and
>
> d. all other damages NuVasive is entitled to recover, at law or in equity.

**COUNT IV (Tortious Interference with Business Relations)**

66. NuVasive, as a leader in the spinal surgical industry, had business relationships with many surgeon customers in Western New York, including Dr. Cappuccino. Defendants acted out of malice and used dishonest, unfair, and improper means by diverting and continuing to divert potential business away from NuVasive to Lanx. Defendants' interference proximately caused injury to NuVasive's business relationships.

67. Defendants' conduct was malicious, wanton, and reckless.

68. As a direct and proximate result of Defendants' tortious interference with NuVasive's business relations, NuVasive was harmed, continues to be harmed, and is entitled to

an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

### COUNT V (Tortious Interference with Contract)

69. In furtherance of their scheme to convert NuVasive's business to Lanx, Defendants recruited other members of NuVasive's sales force to leave NuVasive for Lanx.

70. Defendants knew that these other members of NuVasive's sales force had post-employment obligations to NuVasive.

71. Defendants intentionally, deliberately, outrageously, and successfully solicited and encouraged the other members of NuVasive's sales force to breach their post-employment contractual obligations to NuVasive.

72. There is no legal justification for Defendants' interference with NuVasive's contractual relationship with the other former members of NuVasive's sales force.

73. Defendants actions caused NuVasive to suffer damages which will be proven at trial, but should include:

> a. the compensatory damages NuVasive suffered because of Defendants' interference; and
>
> b. punitive damages.

### COUNT V (Civil Conspiracy)

74. Defendants conspired with Dr. Cappuccino, Lanx, and potentially other unknown actors to further the unlawful scheme to move NuVasive's business to Lanx and damage NuVasive's reputation by:

> a. jointly agreeing that they would breach their duties of loyalty to NuVasive;
>
> b. tortiously interfering with NuVasive's business relationships with its customers and contractual agreements with other members of its sales force; and

      c. misappropriating NuVasive's trade secrets.

75. Defendants' actions in furtherance of this conspiracy harmed NuVasive and caused it to suffer damages which will be proven at trial, but should include:

      a. NuVasive's lost profits caused by the Defendants' conspiracy;

      b. a disgorgement of all benefits Lanx provided to Defendants due to their participation in the conspiracy;

      c. all other damages available to NuVasive, at law or in equity; and

      d. punitive damages.

## DEMAND FOR JURY TRIAL

76. NuVasive demands a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, NuVasive prays that this Court enter judgment against Defendants, and award NuVasive the following relief:

    A. Compensatory damages in an amount to be determined at trial;

    B. Punitive damages in an amount to be determined at trial;

    C. Prejudgment interest;

    D. Attorneys' fees, costs, and disbursements incurred in prosecuting this action; and

    E. Such other and further relief as the Court may deem just and proper.

DATED:    July 27, 2012.

                                By: _/s/ Dawn Brehony_____
                                    Dawn Brehony (DMB8301)
                                    CLAUSEN MILLER P.C.
                                    One Chase Manhattan Plaza, 39th Floor
                                    New York, New York 10005
                                    T: (212) 805-3942; F: (212) 805-3939
                                    dbrehony@clausen.com
                                    Attorneys for Plaintiff
                                    NuVasive, Inc.

492394.1/2012376

*Seeking Admission by Petition:*

Christopher W. Cardwell
Mary Taylor Gallagher
GULLETT, SANFORD, ROBINSON &
 MARTIN, PLLC
150 Third Avenue South, Suite 1700
Nashville, Tennessee 37201
T: (615) 244-4994; F: (615) 256-6339
ccardwell@gsrm.com
mtgallagher@gsrm.com


Michael T. Loffredo (ML3944)
CLAUSEN MILLER, P.C.
One Chase Manhattan Plaza, 39th Floor
New York, New York 10005
T:  (212) 805-3959; F:  (212) 805-3939
mloffredo@clausen.com